NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

EDMON TESFAI YOHANNES, *Appellant*.

No. 1 CA-CR 25-0106

FILED 07-28-2026

Appeal from the Superior Court in Maricopa County
No.  CR2022-138672-001
The Honorable Stasy D. Avelar, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Gracynthia Claw
*Counsel for Appellee*

Apfel Law Group, Phoenix
By Seth Apfel
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge Jennifer M. Perkins delivered the decision of the Court, in which Presiding Judge Michael S. Catlett and Judge Angela K. Paton joined.

---

**P E R K I N S**, Judge:

¶1            Edmon Yohannes appeals his convictions and sentences for two counts of child sex trafficking of a minor under the age of 15 and two counts of attempted sexual conduct with a minor. For the following reasons, we affirm.

**FACTS AND PROCEDURAL BACKGROUND**

¶2            In October 2022, the Chandler and Phoenix Police Departments ran an online sting operation to intercept adults seeking sex with children. As part of this operation, one of Chandler's detectives, Russo, created fake profiles on Grindr, a dating application ("app"), and Kik, a messaging app. He posed as the father of a five-year-old boy and a ten-year-old, special-needs girl.

¶3            On October 9, a user contacted Russo on Grindr. The user referred to himself as a "perv" who was into "naughty stuff." Russo asked to move the conversation to Kik, and the user told him to contact the username "chandlertop2022".

¶4            On October 10, Russo messaged chandlertop2022 on Kik. After that, the conversation quickly turned sexual. Chandlertop2022 expressed it was "hot" that Russo had children, inquired into the children's ages and "experience," asked if he could "play" with the boy, and graphically described the sex acts he wanted to perform on the two children. Chandlertop2022 claimed to have had prior sexual experience with children. To prove he was real, Russo sent a picture of himself wearing a facemask and an adult undercover civilian posing as his daughter. Chandlertop2022 then sent a picture of himself wearing a facemask.

¶5            The two arranged to meet up around 2:40 p.m. at a CVS 25 minutes away from chandlertop2022's house. Russo told chandlertop2022 that his daughter "plays better" with gifts and repeatedly asked if chandlertop2022 could bring stuffed animals, to which chandlertop2022 agreed. To confirm he purchased toys for the children,

chandlertop2022 sent Russo a picture of a stuffed panda and a stuffed Ironman toy. Chandlertop2022 told Russo he would arrive in a black, mid-sized SUV with the stuffed animals on the dashboard.

¶6          Detective LaChance, a Phoenix officer, went to the CVS in Russo's stead. Shortly after 2:40 p.m., Yohannes arrived in a black SUV. LaChance approached and asked if Yohannes had the stuffed animals. Yohannes answered "No," and began to drive away. But as LaChance returned to his vehicle, Yohannes turned around and re-engaged with LaChance. He admitted that he did have the stuffed animals but was "scared." As Yohannes followed LaChance out of the parking lot, police arrested him, seized his phone, and searched his vehicle, where they found a stuffed panda and a stuffed Ironman toy wrapped in a grocery bag in the backseat.

¶7          Yohannes was charged with two counts of child sex trafficking of a minor under the age of 15, and two counts of attempted sexual conduct with a minor under the age of 15. The case proceeded to trial in late October 2024 but ended in a mistrial. The State retried Yohannes in January 2025, and the jury found Yohannes guilty on all four counts. The court sentenced Yohannes to two consecutive 15-year sentences for the child sex trafficking convictions, both designated as dangerous crimes against children ("DCAC"), and two lifetime probation sentences for the attempted sexual conduct convictions. Yohannes now appeals those convictions and sentences. We have jurisdiction. Ariz. Const. art. 6, § 9; A.R.S. §§ 12-120.21(A)(1), 13-4031, -4033(A).

## DISCUSSION

¶8          Yohannes preserved the following issues at trial, so we review them for harmless error. *State v. Henderson*, 210 Ariz. 561, 567, ¶ 18 (2005).

### I.      The good-faith exception did not apply to the State's search of Yohannes' cell phone, but the error was harmless.

¶9          Yohannes argues the State violated his Fourth Amendment rights by searching the contents of his cell phone after the warrant expired, and the court erred by denying his motion to suppress the extracted data as a result. The State does not maintain its argument that the warrant was valid at the time of the search. By abandoning that argument, the State concedes it unlawfully searched the phone. *See State v. Gissendaner*, 177 Ariz. 81, 83–84 (App. 1993). Instead, the State argues for the first time on appeal that the good-faith exception to the exclusionary rule applied. Though such arguments are normally waived, the State raises this

3

argument in support of the court's ruling, and we can affirm the court's denial of a motion to suppress for any legally correct reason. *State v. Boteo-Flores*, 230 Ariz. 551, 553, ¶ 8 (App. 2012). Accordingly, we address whether the good-faith exception applies to the State's unlawful search of Yohannes' phone.

**¶10** We review the denial of a motion to suppress for an abuse of discretion but review the applicability of the good-faith exception *de novo*. *State v. Weakland*, 246 Ariz. 67, 69, ¶ 5 (2019). The State bears the burden of proving the good-faith exception applies. *Id.* at ¶ 7.

## A. Underlying facts.

**¶11** Police lawfully seized Yohannes' phone during his arrest on October 10, 2022. On October 25, LaChance applied for a search warrant for the contents of Yohannes' phone. On November 1, LaChance delivered the phone to Detective Bodine, Chandler's digital forensics detective. That same day, LaChance returned the warrant, claiming he executed it on November 1 with "results pending forensic examination of cell phone." But due to technological constraints, Bodine could not complete the extraction of the phone's contents (the "Cellebrite extraction") until May 2023. In the meantime, Bodine took steps to preserve the phone's contents and prevent the data from being remotely wiped.

**¶12** During pre-trial proceedings, Yohannes moved to suppress the Cellebrite extraction. He argued the State did not execute the warrant to search his phone within five calendar days as required by Arizona Revised Statutes Section 13-3918. The State responded that the warrant was executed on October 25, the day it was issued, because the phone was already in the State's possession. The court agreed with the State and denied Yohannes' motion to suppress.

## B. The court abused its discretion by denying Yohannes' motion to suppress.

**¶13** The Fourth Amendment protects people from "unreasonable searches and seizures" of "their persons, houses, papers, and effects." U.S. Const. Amend. IV. The government generally cannot search a cell phone without a valid warrant. *Riley v. California*, 573 U.S. 373, 386 (2014). A warrantless search is *per se* unreasonable, unless a specific exception applies. *Arizona v. Gant*, 556 U.S. 332, 338 (2009). When the State obtains evidence in violation of the Fourth Amendment, the exclusionary rule allows the court to suppress that evidence to deter future constitutional

violations, but only if "the deterrence benefits of suppression [] outweigh its heavy costs." *Davis v. United States*, 564 U.S. 229, 237 (2011).

¶14 Under the federal good-faith exception, the exclusionary rule does not apply "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence," because "the deterrence rationale loses much of its force, and exclusion cannot pay its way." *Id.* at 238 (cleaned up). The objective standard "requires officers to have a reasonable knowledge of what the law prohibits." *United States v. Leon*, 468 U.S. 897, 919 n. 20 (1984). Arizona has codified a version of the good-faith exception. A.R.S. § 13-3925.

¶15 Under Section 13-3918, warrants are void if not executed within five calendar days of issuance. *State v. Miguel*, 209 Ariz. 338, 340, ¶ 20 (App. 2004) ("[O]ur legislature answers this problem of dissipating probable cause by presuming that probable cause no longer exists after five days."). The warrant can be extended for five more days after that. A.R.S. § 13-3918(A).

¶16 The State no longer argues the warrant was "executed upon issuance" on October 25. Instead, at oral argument, the State argued that even if the warrant was not executed on issuance, the police reasonably believed it was based on federal precedent authorizing the practice for data warrants. This argument is belied by the record because LaChance claimed on the return form that he executed the warrant on November 1, not October 25. This means the earliest date the police believed the warrant was executed was November 1. LaChance did not request an extension, so the warrant expired two days prior on October 30. We do not decide whether Section 13-3918 requires the State to fully extract a cell phone's data within five days because the warrant was void before the cell phone ever crossed Bodine's desk.

¶17 The State argues LaChance acted in good faith because he made "reasonable efforts to comply" with the five-day deadline by applying for a warrant, believing he executed it seven days later, and, in accordance with "common practice," returning it the same day. This argument does not explain why LaChance believed the warrant was valid on November 1. The State offers no explanation for the two-day delay, nor its failure to request an extension. And the State's "common practice" argument is unavailing. Timely returning a warrant does not mean a warrant is timely executed.

¶18 The good-faith exception requires more than a "reasonable effort to comply" with the law; it requires the officer's reasonable, objective belief that his conduct was lawful. From this record, we cannot say LaChance reasonably, objectively believed it was lawful to execute an expired warrant. The State's arguments fail under Arizona's statutory good-faith exception for the same reasons. A.R.S. § 13-3925(B), (F).

¶19 Suppressing the Cellebrite extraction in this case has deterrent value. The State, having properly received a warrant, took no action on the warrant until two days after it expired. The State did so without justification or extension. The State argues suppression was not warranted because probable cause had not grown stale: the crimes were completed, supported by eyewitness accounts, and Bodine took preventative measures to preserve the phone's data. But a neutral and detached magistrate, not the State, must make that determination. *See* U.S. Const. Amend. IV.

¶20 The exclusionary rule is forward-looking. It is meant to deter future police misconduct and is not "designed to redress the injury" suffered by the defendant. *Davis*, 564 U.S. at 236 (cleaned up). The fact that probable cause had not grown stale in this case does not mean that will be so in future cases. Suppression here will deter the State from disregarding the clear deadline set by the legislature for a warrant to be executed. After five days, State must seek either an extension or a new warrant explaining why probable cause still exists. A.R.S. § 13-3918(A).

¶21 The State violated Yohannes' Fourth Amendment rights by searching his phone after the warrant expired. The good-faith exception does not apply because the State has not shown the police reasonably believed they had lawfully executed the warrant two days after it expired. Accordingly, the Cellebrite extraction should have been suppressed, and the court abused its discretion by admitting it.

## C. The error was harmless.

¶22 Because we hold the Cellebrite extraction should have been suppressed as the fruit of an illegal search, we consider whether its admission was harmless. *State v. Davolt*, 207 Ariz. 191, 205, ¶ 39 (2004). An error is harmless if this Court can determine, beyond a reasonable doubt, that the error "did not contribute to or affect the verdict." *State v. Bible*, 175 Ariz. 549, 588 (1993).

¶23 The two primary pieces of evidence that came from the Cellebrite extraction were Kik "remnants" and the existence, but not the contents, of over 9,000 Grindr messages. Remnants are digital artifacts that

remain after an app (such as Kik) interacts with a phone's data, even if the app is deleted. The remnants indicated Kik had been on Yohannes' phone as recently as October 10. The Grindr messages showed that Yohannes used Grindr often and recently. The State did not prove that either the Kik remnants or the Grindr messages were affiliated with the accounts that communicated with Russo.

**¶24** Yohannes argues the error was not harmless because a jury could have found that he was not chandlertop2022 without evidence that he had Kik and Grindr on his phone. He also argues that admitting the amount of Grindr messages unfairly biased the jury against him, as evidenced by potential jurors viewing Grindr as "sketchy" and a "hook-up site."

**¶25** The admission of this evidence was harmless in light of the overwhelming evidence of Yohannes' guilt. The State introduced screenshots from Russo's phone showing the entirety of Yohannes' and Russo's Kik conversation, along with testimony from Russo, LaChance, Bodine, and other investigating detectives, that established:

- Yohannes and chandlertop2022 lived in the same area. Yohannes lived in Chandler, near Ocotillo and Gilbert, and lived 24 minutes from the CVS. Chandlertop2022 lived near Ocotillo and Gilbert, 25 minutes away from the CVS. Yohannes and chandlertop2022 also lived near the same Fry's grocery store, and the stuffed animals were wrapped in a Fry's grocery bag.

- Yohannes and chandlertop2022 have the same physical description. Yohannes is a 6'3" black man who weighs 300 pounds, chandlertop2022's Grindr profile describes him as a large, 6'3" black man. And chandlertop2022's picture showed a black man in a facemask whose hairline, beard, and upper face matched Yohannes.

- Yohannes and chandlertop2022 both drive black mid-sized SUVs.

- Yohannes arrived at the designated location, at the time arranged by chandlertop2022 and Russo. LaChance testified that Yohannes reapproached him and admitted that he had the stuffed animals.

- Yohannes was arrested with a stuffed panda and a stuffed Ironman toy in the backseat of his vehicle. The toys were identical to the stuffed animals in the picture chandlertop2022 sent to Russo.

- Russo sent test messages to chandlertop2022 on Kik after Yohannes' arrest, which chandlertop2022 never opened.

¶26 And the record does not show the empaneled jury was biased against Yohannes due to his frequent Grindr activity. The potential jurors who viewed Grindr negatively were struck during jury selection. On this record, the erroneous admission of the Cellebrite extraction was harmless beyond reasonable doubt.

## II. The prosecutor's conduct, though improper, did not trigger double jeopardy protections.

¶27 Yohannes next argues the court erred by not dismissing his case with prejudice after the mistrial, and that double jeopardy should have barred his retrial. We review *de novo* whether double jeopardy bars retrial. *State v. Moody*, 208 Ariz. 424, 437, ¶ 18 (2004). We review the denial of a motion to dismiss with prejudice due to prosecutorial error for an abuse of discretion. *State v. Korovkin*, 202 Ariz. 493, 495, ¶ 5 (App. 2002).

### A. Underlying facts.

¶28 During opening statements in the first trial, the prosecutor disclosed for the first time that Kik remnants had been found on Yohannes' phone. Yohannes moved for mistrial, arguing the State had never disclosed the remnants to the defense, and Bodine repeatedly stated during defense interviews that he had found nothing of evidentiary value on the phone. The State responded that it had timely disclosed the Cellebrite extraction to the defense over a year prior, that Bodine told the defense he had not found "Kik chats," without referencing "remnants," and that the onus was on defense counsel for failing to ask the right questions. The court denied the mistrial and allowed the first witness, Russo, to testify.

¶29 The next day, Yohannes renewed his motion for mistrial. This time, the prosecutor admitted that, several days before trial, she had searched the Cellebrite extraction and discovered the Kik remnants herself. She had sent a screenshot of her findings to Bodine and asked him to look for the remnants so she could question him about them at trial. The prosecutor had not disclosed to the defense that Bodine would be changing his testimony. At that point, the court declared a mistrial.

¶30 Afterwards, Yohannes moved for dismissal with prejudice or, alternatively, preclusion of the Kik remnants. The court denied Yohannes' motion, finding that the State acted in bad faith, but that dismissal or preclusion were not appropriate sanctions under Arizona Rule of Criminal

Procedure ("Criminal Rule") 15.7. The court did not address double jeopardy.

¶31　　　The State moved for additional findings on its disclosure violation. The court found the State had an obligation to disclose Bodine's change in testimony because the change directly impacted Bodine's credibility and the competency of the investigation. And the court found that the State knowingly and intentionally violated that obligation.

### B. The prosecutor did not act with "indifference to a significant danger of mistrial or reversal."

¶32　　　"Declaring a mistrial after selecting a jury implicates double jeopardy." *State v. Aguirre*, 260 Ariz. 549, 554, ¶ 25 (App. 2025). Double jeopardy prohibits more than one prosecution for a single offense. U.S. Const. amend. V; Ariz. Const. art. 2, § 10.

¶33　　　When a mistrial implicates prosecutorial error, Arizona's double jeopardy clause requires the superior court to dismiss the charges with prejudice if (1) the prosecutor engaged in improper conduct, (2) which "is not merely the result of legal error, negligence, mistake, or insignificant impropriety, but, taken as a whole, amounts to intentional conduct which the prosecutor knows to be improper and prejudicial," and which she "pursues for any improper purpose with indifference to a significant resulting danger of mistrial or reversal," and (3) prejudice to the defendant results "which cannot be cured by means short of a mistrial." *Pool v. Superior Court*, 139 Ariz. 98, 108–09 (1984).

¶34　　　The parties agree the court erred by evaluating the motion to dismiss under the standard for sanctions under Criminal Rule 15.7 (the court has discretion to impose sanctions for disclosure violations) instead of the *Pool* test for double jeopardy. The State concedes that the court's bad faith findings satisfy the first and third *Pool* prongs: that the prosecutor engaged in improper conduct which prejudiced Yohannes. The State also concedes part of prong two: that the prosecutor knowingly and intentionally engaged in the improper conduct. So our inquiry is whether the prosecutor acted for an "improper purpose with indifference to a significant resulting danger of mistrial or reversal." *Pool*, 139 Ariz. at 108-09.

¶35　　　For this inquiry, we look to objective factors, including "the situation in which the prosecutor found herself, the evidence of actual knowledge and intent, any other factors which may give rise to an appropriate inference or conclusion," and "the prosecutor's own explanations of her knowledge and intent." *Id.* at 108 n. 9 (cleaned up).

¶36         Double jeopardy has barred retrial when the prosecutor engaged in a pattern of intentional, egregious misconduct aimed at preventing an acquittal. In *Pool*, the prosecutor was repeatedly abusive, argumentative, and disrespectful to the court, defense counsel, and the defendant with the purpose of avoiding an impending acquittal. *Id.* at 103, 109. In *State v. Jorgenson*, the prosecutor improperly cross-examined the defendant's insanity experts, and accused both an expert witness and defense counsel of unsubstantiated, unethical conduct. 198 Ariz. 390, 390, ¶ 2 (2000) (barring retrial on a special action appeal based on the prosecutorial misconduct described on direct appeal in *State v. Hughes*, 193 Ariz. 72 (1998)). In *State v. Minnitt*, the prosecutor knowingly and repeatedly elicited false testimony throughout two trials. 203 Ariz. 431, 439, ¶¶ 37–38 (2002). And in *Milke v. Mroz*, the conviction relied on the testimony of a detective with a documented history of dishonesty, and the State did not disclose the detective's misconduct to the defense. 236 Ariz. 276, 284, ¶ 21 (App. 2014).

¶37         Conversely, Arizona courts have found double jeopardy did not bar retrial when the prosecutor's improper conduct was unintentional and isolated, and mistrial did not markedly improve the State's position. In *State v. Trani*, the prosecutor did not act with indifference to the threat of mistrial or reversal when a mistrial did not benefit the State, the prosecutor stopped immediately once he realized he stumbled into improper territory, and he explained that his improper comment was accidental. 200 Ariz. 383, 385–87, ¶¶ 11–15 (App. 2001). In *Korovkin*, no double jeopardy violation occurred when a prosecutor made an unintentional, improper comment during opening statements, the prosecutor did not have a motive or specific intent to provoke a mistrial, and the defendant suffered no prejudice. 202 Ariz. at 495–96, ¶¶ 6–10. And in *Miller v. Superior Court*, the prosecutor did not act with the requisite level of indifference, even though he acted intentionally, when he made a single improper comment in response to an improper comment from defense counsel. 189 Ariz. 127, 129–31 (App. 1997).

¶38         Here, the prosecutor acted intentionally and in bad faith by not disclosing the remnants or Bodine's change in testimony, unlike the prosecutors in *Korovkin* and *Trani*. But in *Miller*, intentional improper conduct alone was not enough to show "indifference." So we look to the other circumstances here to determine whether the prosecutor acted "with indifference" to a mistrial.

¶39         Yohannes claims the disclosure violation was the last in a long line of ethical violations throughout his case, indicating a pattern of pervasive misconduct as seen in *Pool*, *Minnitt*, and *Jorgenson*. But Yohannes

made these claims below, and the court found them unsubstantiated. The record supports those findings, which Yohannes does not challenge on appeal. Thus, the prosecutor's conduct was an isolated incident, like in *Miller*, *Korovkin*, and *Trani*.

**¶40**        Like *Korovkin*, the prosecutor's improper conduct and resulting mistrial occurred at the very beginning of trial. The trial was not going poorly for either side because it was barely underway. So the State was not faced with the "significant danger of acquittal" seen in *Pool*. 129 Ariz. at 109.

**¶41**        Nor did the State have a motive to cause a mistrial because it would not markedly improve the State's position. As discussed *supra* ¶¶ 22–26, the Kik remnants and Bodine's accompanying testimony were harmless when compared to the overwhelming evidence of Yohannes' guilt. Any benefit the State gained by starting over was minimal. And the State opposed the mistrial at every turn. *But see Trani*, 200 Ariz. at 386, ¶ 14. (lack of opposition to mistrial alone is not proof of an improper purpose because prosecutors have a duty to seek justice over convictions).

**¶42**        The improper conduct in this case is more like the intentional and isolated improper comment in *Miller* than the pattern of egregious misconduct in *Pool*, *Minnitt*, *Milke*, and *Jorgenson*. The court did not err in declining to dismiss the case with prejudice following the mistrial.

## C. Any error from declining to preclude the Kik remnants was harmless.

**¶43**        Alternatively, Yohannes contends he should have been given an opportunity to reconsider any previous plea offer under Criminal Rule 15.8 once the State's disclosure violation came to light. Upon a defendant's motion alleging a State disclosure violation, Criminal Rule 15.8(d) requires the court to consider the impact of the nondisclosure on the defendant's decision to accept or reject a plea offer. If the court finds the disclosure violation materially affected the defendant's decision, and if the State does not reinstate the plea offer, "the court—as a presumptive minimum sanction—must preclude" the improperly disclosed evidence. Ariz. R. Crim. P. 15.8(d) (cleaned up).

**¶44**        Criminal Rule 15.8(d) does not apply if the evidence "did not exist, or the State was not aware of it," when the State made or withdrew a plea offer. Ariz. R. Crim. P. 15.8(c). Yohannes has not alleged that a plea offer was open when the State discovered the Kik remnants, nor is there any evidence in the record of an open plea offer at that time. So even if

Yohannes rejected previous offers with the understanding that the State found nothing on the phone, Criminal Rule 15.8(d) does not apply because the record shows the State was also unaware of the remnants when it extended the prior offers.

**¶45** Yohannes also argues that preclusion was the only appropriate remedy for the State's disclosure violation under *State v. Killean*, 185 Ariz. 270 (1996), and allowing the State to use the Kik remnants in the second trial violated traditional notions of justice and fair play. As discussed *supra* ¶¶ 22–26, any error from the wrongful admission of the Kik remnants was harmless, so we need not decide whether the court abused its discretion by admitting it.

### III. Yohannes' statements admitting to prior sexual acts with children were admissible.

**¶46** Yohannes next argues the superior court improperly admitted other acts evidence. We review a court's evidentiary rulings for abuse of discretion. *State v. Aguilar*, 209 Ariz. 40, 49, ¶ 29 (2004). At issue are several statements Yohannes made to Russo on Kik claiming to have had prior sexual contact with children: (1) "I had access when I was younger so done anal oral everything really"; (2) "For a while I used to have my brother and his friend both very young play together and me"; and (3) "I def know how to be gentle, have had younger than both before". The court admitted this evidence under Arizona Rules of Evidence ("Evidentiary Rules") 404(b) (admissible for a non-propensity purpose), 404(c) (admissible to show aberrant sexual propensity), and 803(3) (state of mind exception to hearsay). Yohannes does not challenge the rest of the Kik conversation, which involved admissible party-opponent statements. *See* Ariz. R. Evid. 801(d)(2)(A).

### A. The State used the statements as proof of what Yohannes said, and not as proof of his past actions.

**¶47** The State maintains that it did not use the statements to show that Yohannes had previously sexually abused children, but that he made the statements—true or not—to convince Russo that he was serious about meeting up and having sex with children. Yohannes contends the State also used these statements as other act evidence to show he had previous sexual experience with young children, and the State failed to prove his statements were true by clear and convincing evidence as required under Evidentiary Rules 404(b) and (c).

¶48          The record shows the State introduced the statements, not the underlying conduct, to show intent. The State told the court,

> What the defendant said could have been a total lie. It's possible he didn't have brothers. It doesn't matter whether he does or whether he actually engaged in sex acts with brothers at some point. What matters is that he's telling the statements to the detective to show that this is not mere fantasy, he's serious, and he actually wants to have sex with these two kids.

And at trial, the prosecutor told the jury, "And again, we don't know if the Defendant is serious and he's actually been doing this kind of stuff with his younger brother and younger friend, but he's bragging about it and telling the detective that when he was younger, he was molesting kids." And later: "How do we know the Defendant's intention in this case? Well, we don't have to guess. He told us what his intention is. He claims he previously had access to kids . . . And then we know he wants it now." The jury could infer that Yohannes had previously sexually abused children from these statements. But the State did not introduce evidence that the statements were true and never claimed to the jury the statements were true. One of Yohannes' noticed defenses was lack of intent; he argued at trial that he believed he was meeting up with an adult woman who would pretend to be a child. His claim of having sex with children previously indicated that he knew he was arranging to have sex with children in this case. The record supports that the State used these statements to show Yohannes' intent.

    **B.  Because the State did not use the statements as evidence of past acts, Evidentiary Rule 404 and the intrinsic evidence doctrine do not apply.**

¶49          Under Evidentiary Rule 404, evidence of a defendant's prior bad acts is inadmissible unless the State uses the evidence for a proper, non-propensity purpose or to prove aberrant sexual propensity. Ariz. R. Evid. 404(a)–(c). Evidentiary Rule 404 only applies if the evidence is introduced "to show that the alleged crime or bad act actually occurred." *State v. Cannon*, 148 Ariz. 72, 75 (1985). For example, in *Cannon*, a defendant's statements confessing to other crimes were not governed by Evidentiary Rule 404 because the State introduced the statements to prove the defendant's confession was voluntary, and not to prove the defendant had committed the other crimes. *Id.*

¶50　　　　Here, the State did not introduce the statements as proof that Yohannes sexually abused children in the past. The State introduced the statements because, whether Yohannes was telling the truth or not, claiming he had "experience" advanced his plans to sexually abuse children here. In other words, it is the fact Yohannes made the statements, and not the fact that he committed the bad act, that proves Yohannes' intent. This is not other acts evidence. Thus, the statements did not need to be admitted under Evidentiary Rule 404.

¶51　　　　For the same reason, we reject the State's argument that the statements constituted intrinsic evidence. The intrinsic evidence doctrine applies to acts that are "so closely related to the charged act that they cannot fairly be considered other acts, but rather are part of the charged act itself." *State v. Ferrero*, 229 Ariz. 239, 242, ¶ 14 (2012) (cleaned up). It does not apply to statements introduced for non-substantive reasons.

### C. Yohannes' statements are otherwise admissible.

¶52　　　　The rule against hearsay also does not bar the statements. Out-of-court statements offered for the truth of the matter asserted are hearsay, and generally inadmissible, unless an exception or exclusion applies. Ariz. R. Evid. 801(c), 802. The State did not offer Yohannes' statements for their truth, which means they are not hearsay.

¶53　　　　Instead, the statements' admissibility was governed by Evidentiary Rule 403. *See Cannon*, 148 Ariz. at 75–76. Under Evidentiary Rule 403, relevant evidence is inadmissible if its probative value is substantially outweighed by the potential for unfair prejudice. The court found the statements were relevant and not substantially outweighed by unfair prejudice.

¶54　　　　Yohannes argues the statements failed Evidentiary Rule 403 balancing because they were cumulative to other statements in the Kik conversation, and the prejudicial effect far outweighed the statements' probative value. The statements were not cumulative. Yohannes argued that the Kik conversation was mere "fantasy" involving adults pretending to be children. His statements admitting to previous sex acts with children negated that defense. So the court did not abuse its discretion in admitting the statements.

¶55　　　　We need not address Yohannes' argument that the Grindr messages were inadmissible, irrelevant other acts evidence because we have already held the messages should have been suppressed as part of the Cellebrite extraction, and their admission was harmless. *Supra* ¶¶ 25–26.

## IV. The detectives' internal affairs investigations were inadmissible impeachment evidence.

**¶56**        Next, we consider whether the court erred by precluding Yohannes from cross-examining Russo and Sergeant Applegate about their previous disciplinary history. We review a court's ruling limiting cross-examination and admissibility of impeachment evidence for abuse of discretion. *State v. Ellison*, 213 Ariz. 116, 131–32, ¶ 52 (2006).

**¶57**        Yohannes contends the court violated his Sixth Amendment rights to confront witnesses and present a complete defense. He argues the court wrongly considered whether the reprimands were probative for the detectives' character for truthfulness, instead of whether the reprimands were probative of the detectives' credibility generally.

**¶58**        A defendant's constitutional rights to confrontation and due process "are not without limit, and states may establish rules that allow the exclusion of evidence where its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *State v. Abdi*, 226 Ariz. 361, 367, ¶ 27 (App. 2011) (cleaned up) (quoting *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006)). And the superior court has wide discretion under the Confrontation Clause to impose reasonable limits on cross-examination. *Id.*

**¶59**        Evidentiary Rule 608(b) poses one such limit by restricting the ways a party can attack a witness's credibility. A witness can only be cross-examined on a specific instance, such as a detective's prior reprimand, when that instance is probative of the witness's character for truthfulness or untruthfulness. Ariz. R. Evid. 608(b). The court was within its discretion to apply Evidentiary Rule 608(b) and consider whether the reprimands were probative of truthfulness.

### A. Russo.

**¶60**        Yohannes sought to impeach Russo with a 2014 reprimand for inattentiveness and inaccurate report writing. The 2014 reprimand was not probative of Russo's character for untruthfulness. It was thus inadmissible under Evidentiary Rule 608(b). Yohannes argues in his Reply that he should have been allowed to cross-examine Russo about his reprimand because he lied about it in defense interviews, but Yohannes did not raise this argument in his opening brief, so he waived it. *See State v. Cohen*, 191 Ariz. 471, 474, ¶ 13 (App. 1998).

**¶61** Even if the State opened the door by introducing evidence of Russo's accolades like Yohannes argues, any error was harmless. Yohannes extensively battered Russo's credibility throughout trial. He accused Russo of inaccurate report writing, making assumptions, failing to document details, and conducting a sloppy investigation without introducing his 2014 reprimand.

## B. Applegate.

**¶62** Applegate was one of the detectives on scene when Yohannes was arrested and corroborated LaChance's version of events. The court precluded Yohannes from cross-examining Applegate with his disciplinary history. Yohannes challenges only the preclusion of a 2007 reprimand for failing to report other officers' misconduct, arguing it bore on Applegate's character for untruthfulness. Yohannes made this argument twice before the superior court, and the court found the 2007 reprimand more prejudicial than probative because it was almost 20 years old. Yohannes has not challenged that finding as an abuse of discretion. The court did not err by precluding evidence of Applegate's 2007 reprimand.

## V. There was sufficient evidence for the jury to find a fee arrangement existed.

**¶63** Yohannes next argues there was insufficient evidence to support his convictions for child sex trafficking because there was not an explicit agreement in the Kik messages that the stuffed animals would be part of a "quid pro quo." We review the sufficiency of the evidence *de novo*. *State v. Pena*, 235 Ariz. 277, 279, ¶ 5 (2014). We resolve all inferences against the defendant and reverse only if there is not substantial evidence to support each element of the conviction. *State v. Cox*, 217 Ariz. 353, 357, ¶ 22 (2007). Substantial evidence is evidence that a reasonable juror "could accept as sufficient to support a guilty verdict beyond a reasonable doubt." *State v. Hausner*, 230 Ariz. 60, 75, ¶ 50 (2012).

**¶64** Child sex trafficking is knowingly engaging in prostitution with a minor under 15 years old. A.R.S. § 13-3212(B)(1). "Prostitution" means agreeing "to engage in sexual conduct under a fee arrangement with any person for money or any other valuable consideration." A.R.S. § 13-3211(5).

**¶65** Here, there is substantial evidence to support the fee arrangement element. Russo told Yohannes to bring stuffed animals because his daughter "plays better" with gifts. Russo repeatedly told Yohannes he needed to get the children stuffed animals and asked for

confirmation that Yohannes would bring them. Yohannes asked if the daughter would perform oral sex on him, to which Russo said, "Yeah. But you better give her the stuffed animal before." And after Yohannes sent pictures of the stuffed animals, Russo said, "You're getting off so cheap with stuffed animals for such fun." This evidence was sufficient for a jury to find beyond reasonable doubt that Yohannes offered the stuffed animals in exchange for sex with the children, satisfying the fee arrangement element.

¶66　　　　The State acknowledges that another reasonable jury could have found the stuffed animals were a gift for the children, like Yohannes urges. But Yohannes presented that theory to the jury, and the jury rejected it. We will not reweigh the evidence, *State v. Borquez*, 232 Ariz. 484, 487, ¶ 9 (App. 2013), and a second reasonable interpretation of the evidence does not mean there was insufficient evidence for a conviction, *see State v. Bustamente*, 229 Ariz. 256, 258, ¶ 5 (App. 2012).

### VI.　　The child sex trafficking convictions were properly enhanced as Dangerous Crimes Against Children.

¶67　　　　After Yohannes filed his opening brief, our supreme court issued *State v. Marner*, 261 Ariz. 275 (2026), holding that Section 13-705 does not require an actual minor victim for a sentence to be enhanced as a DCAC. *Id.* at 285, ¶ 47. Yohannes concedes that *Marner* controls, and as such, his child sex trafficking convictions were appropriately designated as DCAC under Arizona law.

### CONCLUSION

¶68　　　　We affirm.



**MATTHEW J. MARTIN • Clerk of the Court**
**FILED**:　　　　JR